Good morning, your honors. My name is Colin McBeth and I represent the appellant Jovon Medley. Your honors, Detective Dalton went to the D.C. jail in January of 2017 to interview Mr. Medley about a carjacking that allegedly involved the same gun he was charged with possessing in D.C. His purpose in going to the jail was to ask Mr. Medley about that particular gun and he knew that the two offenses tied to that gun, the carjacking and the felon possession charge, occurred just one day apart. He therefore knew or should have known that those two offenses were intertwined and that it would be impossible for Mr. Medley to answer questions about the gun used in the carjacking without incriminating himself with respect to the D.C. offense. And yet, Detective Dalton led Mr. Medley to believe that any statements he made could not be used against him in the D.C. case. Detective Dalton introduced himself as a member of the Prince George's County, Maryland Police Department. He specifically said he was not from the Metropolitan Police Department in D.C. He told Mr. Medley he was quote, there not to speak to him in reference to the details of his D.C. arrest and said he was quote, only there to speak to Mr. Medley about his investigation in Maryland. He said quote, he wasn't worried about the D.C. case and instead was worried about the Maryland case. To quote the government's brief, Detective Dalton made it abundantly clear that he was not interested in the D.C. case. And he never told Mr. Medley that his D.C. counsel could be present or that any statements he made could be used against him in the D.C. case. Under these circumstances, the government has not carried its heavy burden of showing that Mr. Medley knowingly and intelligently gave up his right to have counsel in the D.C. case present. Mr. Medley had not been made effectively aware of his right to have D.C. counsel present or of what the Supreme Court in Patterson called the possible consequences of undergoing questioning without the aid of counsel, which is that those statements could be used against him in the D.C. case. The clear effect of Detective Dalton's assurances was to make Mr. Medley believe that anything he said would not be used in that case. And to the extent this Court has doubts about whether Mr. Medley understood the possible consequences of questioning, those doubts must be resolved in favor of Mr. Medley's constitutional rights as this Court and the Supreme Court have held repeatedly. Use of those statements, therefore, violated his right to counsel in the D.C. case. And that case, as we explain in our briefs, involved the same offense as the federal felon in possession offense charged in the District of Maryland. For purposes of deciding whether two offenses are the same under the Double Jeopardy Clause, courts have to answer two questions. First, whether those offenses involve the same elements, and second, whether they are brought by the same sovereign. In this case, the federal felon in possession charge has three elements. That a defendant was an ex-felon, that he possessed a firearm, and that the firearm moved to interstate commerce. The D.C. offense has only two elements, that the defendant is an ex-felon and that he possessed a firearm. So there is one more element for the federal offense and for the D.C. offense, but the Supreme Court has said in the Brown v. Ohio case that a lesser included offense and a greater offense are the same offense for Double Jeopardy. The government makes a big deal of the fact that the D.C. statute says that someone who was found within the District of Columbia to possess a firearm is guilty. But that determination of where the possession occurs is not an element of the D.C. offense. That determination is not made by a jury. It's made by the judge, and it's referred to in D.C. courts as a question of law, not a question of fact. D.C. courts in fact presume that jurisdiction is proper if it's charged in the indictment, and courts never presume elements to be met. And in cases where D.C. courts are reviewing felon possession offenses, they always evaluate the sufficiency of the evidence separately from the question of subject matter jurisdiction. Subject matter jurisdiction in D.C. is essentially the same thing as venue in a federal court. It goes to the power of the court to hear a case, not the question of whether a defendant has in fact committed a crime. Under the government's theory, in this case, for instance, the defendant, the government had to prove that the events giving rise to liability took place in the District of Maryland, because the venue had to be proper in Maryland. But that does not mean that occurrence of those acts in Maryland was an element of the federal offense, and the government has not argued that, because this court has held in the Engle case, which we cite in our brief, that venue is not a substantive element of an offense. It's simply a separate question of where it is proper to try an offense. Under the government's theory, if location, venue, were an element of the offense, then every offense in the U.S. Code would actually define 93 separate crimes, one for each federal district in which someone could commit a crime, because if the case happens in Maryland, venue has to be proven in Maryland. If it happens in Virginia, it has to be proven in Virginia. Those are mutually exclusive, and therefore, we'd have two separate offenses. But this court has held, and as far as I know, every other court has held, that the venue statute means that an offense can be tried in one jurisdiction or another, but not both, and that's because jurisdiction or venue is not an element of the offense. It's simply something about where the crime occurred. So given that the only difference in this case is that the same offense for double jeopardy purposes. We also have the same sovereign. The District of Columbia is, Congress has plenary control over D.C. D.C. has the power to enact laws only because Congress has given D.C. that power, and Congress, in fact, retains authority to essentially override any acts that are passed by the D.C. City Council, because under the Constitution, it's a federal enclave, essentially. The fact that D.C. used to be part of Maryland, or at one point applied Maryland law, is simply irrelevant. Under the Supreme Court's opinion in the Sanchez-Valle case, which we cite in our brief, the only question that matters at all for double jeopardy purposes is the ultimate source of a prosecuting authority's power to prosecute, and in this case, that power comes from Congress, which conferred it by statute under the Home Rule Act, and could take it back at any time. We also point out in our brief that being a felon in possession of a firearm is a continuing offense, and the government seems to suggest that that somehow alters the double jeopardy analysis. But I'd like to point the court to the Brown v. Ohio case, which we cite in our brief, which actually addresses this question. And in that case, the defendant was charged with theft of a car on one day, and joyriding the same car nine days later. And under Ohio law, joyriding is a lesser-included offense of theft, and so the Supreme Court said they're the same offense because one is a lesser-included of the other. And the state of Ohio argued that notwithstanding that fact, we actually had two offenses because the dates charged for those two offenses were different. One was nine days apart from the other. And the double jeopardy clause, quote, is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units. So in other words, you can't get around the double jeopardy clause just by putting different dates on the same crime. And in fact, they then drop a footnote, and they say, we would have a different case if the Ohio legislature had provided that joyriding is a separate offense for each day in which a motor vehicle is operated without the owner's consent. Meaning, in other words, joyriding is a continuous offense. If it weren't, if it were the case that each day is a separate offense, then it would be a different analysis. But because joyriding is a continuing offense, the fact that different dates are charged simply doesn't matter. And every court I'm aware of has held that being a felon in possession is a continuing offense, and that possession is presumed to continue unless there's affirmative evidence that possession has been interrupted, which we don't have in this case. Counsel, can I go back to, I think, your first point? And I want to make sure I'm following it. Is your argument, you know, it looked like from the briefs that you were focusing on the Sixth Amendment, you know, more so than the Fifth. Is that, am I, am I correct in that regard? That's correct, Your Honor. Does the Sixth Amendment apply before the defendant is charged? No. So the Sixth Amendment only applies once, it attaches once, you know, adversary criminal proceedings have begun. So in this case, the government has agreed that Mr. Medley's Sixth Amendment right had attached as to the D.C. charge. As to the D.C. charge. Right. No, we're not contending that it had attached at the time of interrogation to any other offense. To the Maryland charge. Right. We're just saying it attached to the D.C. offense, and that because that is the same offense as the federal felon in possession charge, it had attached to that charge as the Supreme Court said in the Cobb case that, that the, you know, once the Sixth Amendment attaches, it applies to any other offenses, even if they haven't been charged yet, that would be the same offense under the double jeopardy analysis. And we, you know, as we say in the brief, we're, for the purposes of this appeal, happy to stipulate that Mr. Medley waived his Miranda rights as to uncharged offenses. But the Supreme Court has said in multiple cases that Fifth Amendment and Sixth Amendment right to counsel waivers are not necessarily co-extensive, and the McNeil case talks about that. It's perfectly possible to assert your Sixth Amendment right as to a charged offense while simultaneously waiving your Miranda rights as to uncharged offenses. And if the court talks about that in Patterson as well, it says, quote, there will be cases where a waiver which would be valid under Miranda will not suffice for Sixth Amendment purposes. And that's, I think, what we have here is that Mr. Medley, he was told, you know, to use the government's words, it was abundantly clear at the beginning of this interview that this detective was not from D.C., he was not interested in the D.C. case, he was not asking about the D.C. case, he was just talking about the Maryland case. And so I think, you know, again, especially given the fact that this court is supposed to indulge every reasonable presumption against the waiver of a constitutional right, I think that the only reasonable conclusion is that Mr. Medley, notwithstanding that he asked questions, did not understand himself to be giving up his Sixth Amendment right as to the charge that had attached at that point, which was the D.C. offense. And so, you know, the government in its brief focuses a lot on the fact that the detective understood himself to be investigating a carjacking offense, which, you know, may well be true, but is simply irrelevant. Mr. Medley had a Sixth Amendment right not to be asked about the D.C. offense without his counsel present. Whether the detective subjectively understood himself, you know, to be asking about that or something else, his subjective motivation is just not relevant to what Mr. Medley was answering questions about. And in fact, the Supreme Court has said in the Maine v. Moulton case, which the government cites in its brief, that the state in that case raised essentially the same argument, which was the undercover informant who was with the defendant was investigating not only offenses that had been charged, but also uncharged offenses. And the Supreme Court said that's irrelevant. It says, quote, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if in obtaining this evidence the state violated the Sixth Amendment. And so, because that happened in this case, it just doesn't matter what the state thought it was investigating or was trying to investigate. That's not relevant to the analysis. I'd like to reserve some time for rebuttal, if I may, Your Honor. Thank you. Mr. Walker. May it please the court, Brendan Walker on behalf of the United States. The government respectfully submits that two fundamental rules of Sixth Amendment jurisprudence dictate that the court reject the defendant's Sixth Amendment claims here. First, a defendant who has been charged and appointed counsel may nevertheless waive his Sixth Amendment right to counsel and speak with law enforcement after having been advised of his Miranda rights. Second, the Sixth Amendment is offense-specific and does not attach until the charges under investigation have been charged formally and the adversarial process has begun. Both of these rules apply time and time again in every Supreme Court case either side has cited to this court. That is, that the Sixth Amendment's right to counsel is not to be interpreted to deter police from investigating new or additional crimes. As the Supreme Court wrote in Texas v. Cobb, the Sixth Amendment's right to counsel does not negate society's interest in the ability of police to talk to witnesses or to suspects, even those who have been charged with a crime. Application of that principle and those two rules to this case demand affirmance. When the Prince George's County Police Department went to go talk to the defendant at the D.C. jail on January 31st of 2017, they were acting on the one and only lead they had into who had committed an attempted murder and carjacking the day about a month prior. The gun, one of two guns, in fact, that the defendant had been found with in D.C. matched the gun that had been used in the carjacking and attempted murder. So they did what every good detective did, does. They followed the lead. They didn't know at the time whether the defendant was in fact the culprit or whether, as happens so often, he had simply obtained the gun from the real culprit after that person had discarded it. But they went to the D.C. jail. They advised the defendant of his Miranda rights. They advised the defendant of who they were and why they were there. And then they proceeded to ask him questions. The Sixth Amendment requires no more. Now, the defendant has two objections to this. First, he says the waiver is, was not knowing or intelligent. And second, he says that somehow the defendant's Sixth Amendment defense that had not yet been charged in a completely different jurisdiction somehow had already attached when Detective Dalton and the other detectives from Prince George's County walked into the D.C. jail case, into the D.C. jail that day. I'd like to take each of these in turn. First, the waiver. The Supreme Court in Paterson v. Illinois and Monteo v. Louisiana has made clear that ensuring the voluntariness of a waiver under the Fifth Amendment simultaneously ensures the voluntariness of the Sixth Amendment waiver. Whatever warnings suffice for Miranda purposes, the Supreme Court has written, also suffice for post-indictment interview. Here, the District Court found, and the defendant does not appear to dispute, that the detectives properly Mirandized him, telling him each of the rights that he had under the Fifth Amendment. That is, that his right to remain silent, his right to counsel, his right, or the fact that anything he said would be used against him in a court of law. They paused, Judge Grimm found, after each of these rights, made sure he understood them and acknowledged that before proceeding. They then went even further, told him who they were, told him who they were and why they were there, told him they were going to ask him about the gun that he had been found with because it had been linked to a carjacking and attempted murder they were looking into, told them they weren't interested in the D.C. arrest. He had been charged with the gun, correct? He had been charged with possessing one of the guns in D.C., yes sir. And they also knew the gun was involved in the other crime that they were investigating, correct? Yes sir, your honor, the PG County Police knew that the gun was involved in the carjacking and attempted murder that the state police were investigating. So they knew that that would implicate him, perhaps, in the crime that he was charged and he had Sixth Amendment rights to counsel. No, your honor, the state police, I'm sorry. How would it not? Because they were state police. Detective, if you told Detective Dalton what 18 U.S.C. 922-G was, he would look at you funny because he four months later may or may not be charging. He would need to be a wizard on the code but he could figure out pretty quickly that you're charged with gun A and then you're investigating carjacking that was committed with gun A because that's connected, wasn't it? Your honor, the Supreme Court has made clear that just because two crimes are factually connected does not stop any police, even the same police, from going in and questioning you. That is not what the Sixth Amendment, that's Texas v. Cobb. In Texas v. Cobb, the Texas State Police, a man, the defendant, called the Texas State Police about a burglary and the disappearance of his wife and child. Soon, evidence developed that the man who had called, in fact, had committed the burglary and the police also suspected him of the disappearance of his wife and child. They charged him with the burglary and after that, after his Sixth Amendment rights had indisputably attached to that crime, they went back and asked him about the disappearance of his wife and child, even though those were obviously factually connected. The Supreme Court in Texas... Hey, you have a problem with the double jeopardy analysis that couples it, don't you? Here. No, your honor. As Judge King's opinion for the court in wholeness made clear, there is no double jeopardy problem when the two crimes at issue, one is being investigated by the state and the other one is charged by the federal government here. You don't have that here. There's no dual sovereignty. Yes, there is, your honor. Really? Because the people asking the questions, the people who the defendant believes actually committed the Sixth Amendment violation are the Maryland State Police. There is no question here that the federal government was the ones who asked Mr. Medley these questions. It was the Maryland State Police... So you think dual sovereignty depends on who the person is asking the question, not the authority in terms of who's prosecuting? Your honor, in every single case in which the Sixth Amendment has been applied, the comparison has been between the people doing the investigation and the charges which are brought. Because otherwise, you'd have federal charges retroactively, months later, retroactively rendering unconstitutional an interview conducted by state officials over which no federal official had any control. There's nothing, it's not like there's no evidence that the state officials were colluding with or under the control of the federal government when they went to interview Mr. Medley. It would be quite odd if a federal charging decision would render that interview unconstitutional. In fact, as Judge King wrote for the court in wholeness, there is never the case that when the crimes being investigated by state police are never the same because of the dual control of the federal government. In fact, a much closer case, for example, is Alvarado, which Judge King cited in the wholeness case in which this court held there was no Sixth Amendment problem when Virginia State had charged a defendant with a drug conspiracy. And while those charges were pending after the Sixth Amendment had attached, ATF agents went in to the Virginia jail and asked them questions essentially about the same conspiracy. There was a question and dispute in the case about the scopes of the conspiracy and whether they were overlapping or not sufficiently for the double jeopardy purposes. But this court held it doesn't matter because there's dual sovereigns. And you compare the people asking the questions in that case, the ATF, versus the charges that were brought in that case, the ones in Virginia State. So it would be unlike any constitutional right if the federal, if the decisions of an AUSA four months after the interview could somehow retroactively turn the interview in unconstitutional. I don't know any right that's like that. And it would do exactly what this court and the Supreme Court has said should not happen in the Sixth Amendment, which is to deter police from asking any questions altogether. Think about it from Detective Dalton's perspective. What was he supposed to do? He was investigating an attempted murder. If the defendant is right, just because the fact that the gun that the defendant possessed was the same gun that was involved in his crime means he can't go talk to the guy, which is exactly the problem that every Supreme Court case that has been cited to you was trying to avoid. The idea that we should not stop police from legitimate investigations into violent crimes such as carjacking and attempted murder. I would also just say that the court need not reach this double jeopardy question because the waiver here is so clear. But is that right? I mean, back to that point, I mean, that Mr. Medley was told there was no issue, that he wasn't being questioned about the D.C. matter. And he gave testimony or gave statements that then became, you know, pertinent, you know, dispositive effectively on a maybe not double jeopardy crime or offense, but one very, very close to. It may be because it's not charged, that's the escape hatch, for lack of a better word. But it sure feels odd that you could tell the defendant, I'm not talking to you about this felony and possession charge, he gives testimony and then later he's charged with essentially an identical federal crime. Does that, I mean, that sure feels like it raises questions about the knowing and voluntarily aspect of the statements. So before Montejovi, Louisiana came down, Your Honor, it would be correct that Michigan, the Michigan case that Montejovi, Louisiana reversed, held that after someone is charged, the police couldn't go and talk to an individual. Although arguably, in this case, because they were different offenses, that wouldn't apply. But after Montejovi, Louisiana, there's no question that even the same police who are trying to get evidence about the same crime to which the Sixth Amendment has unquestionably attached are allowed to go back, interview the person in custody after mirandizing them. And that is perfectly okay. It would seem quite odd that completely separate sovereigns, the Maryland State Police, are not permitted to investigate a completely different crime after having properly advised him of his Miranda rights. It would be turning the Montejo case on its head to say the more attenuated you get, the more problems there are in the Sixth Amendment analysis. I mean, that's what Texas v. Cobb is all about. The fact that we're not going to try and stop cops from investigating crimes just because they've been charged with one crime. We're going to do this double jeopardy analysis because we don't want law enforcement to be able to do an end run around the Sixth Amendment. We don't want the cops to be able to say, well, we only charged him with one gun and not the other gun, so we can ask him about the other guns. But that's not the case here. It is not questioned that the Maryland State Police, when they went to interview Mr. Medley, were at all interested in his way of the D.C. robbery, or really his possession of the gun, other than as it related to the carjacking and attempted murder. And the fact that they would have to have been intentionally concealing that in order, is that your position? In Montejo v. Meade, Louisiana, and in Patterson v. Illinois, both the Supreme Court has suggested that obviously if there was an affirmative misrepresentation about why they were there or about the rights, really, such that it would call into question the intelligence of the waiver, that could be a problem. And for example, in the footnote that Mr. McBeth cited to you, the Supreme Court noted the Moran case, in which the police had held from the defendant the fact that his lawyer was trying to get a hold of him at the time that they were interviewing, essentially keeping the lawyer from him. And that, the court held, meant that the waiver was null and void. But we have nothing like that. I mean, if you listen to the things that Mr. McBeth talked to you about, all of the things that the police told Mr. Medley were unquestionably true. They weren't interested in his D.C. arrest. They were there to talk about the gun. And that's because it was related to an attempted homicide and carjacking they were investigating. There's no misrepresentation there. They weren't worried about the gun. I'm sorry? They weren't worried about the gun. They weren't concerned about the gun. And that's what they told him? They told him they weren't there for, about his arrest. And they were, they told him affirmatively that they were there about the gun. Because that's why, the only reason they were there. It's the only thing they had linking him to the crime. They told him affirmatively, and this is at- About that crime, about the possession of the gun was not their concern. They said that they, I just want to be accurate, Your Honor, the detectives told the defendant that they weren't there about his D.C. arrest. They were there about the gun. And of course they were there about how he got it, how long he had had it, and those were all the questions they asked him. So I think that it's clear from Montejo that if the same police can go into a room and mirandize the suspect, and that's good enough for the Sixth Amendment, then if other police, unrelated to the crime to which your Sixth Amendment rights have attached, can go in and talk to you about crime, that those police, if they properly mirandize you, can certainly ask questions about crimes to which the Sixth Amendment has not attached. So for that reason, we think the easiest and most straightforward way to affirm the defendant's conviction is the waiver, but also want to make clear that the defendant's Sixth Amendment rights had not attached to the crimes that the police in Maryland were investigating. And the contrary rule, as I've said, would go against exactly what the Supreme Court has warned against, and would, just to go back to Texas v. Congress. What do you do about this Ruhoff issue? Rehafe. Your Honor, I can't pretend to understand. I go Rehafe, Ruhoff. I'll defer to the Court. So Your Honor, both parties agree that the plain error standard applies. I know that's still an open issue, but at this point, seven courts of this Court's sister circuits have held that... Does the government have a uniform position nationwide? Your Honor, the government believes that plain error, where it's not preserved below, the plain error standard applies to Rehafe errors. Yes, Your Honor. They believe, the government also believes, as in this case, that the third and fourth elements of the plain error test have not been satisfied. The defendant has met his burden to show, in this case, that the outcome would have been different. So you assume the first two elements are satisfied? Yes, Your Honor. But say third is not, and fourth is not? Yes, Your Honor. What if it's determined to be a structural error? Your Honor, if you look at the Supreme Court's cases in Kneader v. United States and Cotton v. United States, both of those describe what constitutes a structural error. And to borrow from Justice Breyer in the Kneader case, in that case, the question was whether, like here, whether the failure to submit an element of a crime to the jury was a structural error, or whether it was subject to prejudice review, harmless or plain. And the Supreme Court said, no, failure to, even failure to submit an element of a crime to a jury is not structural error. And it looked at the kinds of things that the Court has, the very few limited cases where the Court has found structural error, that being bias of a judge, or the public trial right, or racial discrimination in selecting a jury. And it said those kinds of things affect the framework of the trial, the entirety. It affects each and every bit of the trial. But when you're talking about the elements, the particular evidentiary issues, the Supreme Court in Kneader, and again in Cotton, said, no, those don't, those are not structural. Those are subject to- And I didn't came from here, did I? Cotton is actually a Supreme Court, it came from the Fourth Circuit, yes, Your Honor. It came from the Fourth Circuit, yeah. And those cases are instructive here as well, because those cases are about whether failure to have an element of an indictment would be a structural error. Those are post-apprendee cases where the indictment failed to allege a specific drug quantity that raised, the drug quantity that would raise the mandatory maximum, the applicable statutory maximum. Well, Cotton overturned Banks. Yes, Your Honor. Right. Yes, Your Honor. I was on the panel. Yeah, so I admit I haven't read the underlying opinion. I've only read the Supreme Court case. But this court has applied Cotton to say that failure even to have an element in the indictment is not structural error. Because, and that's consistent, by the way, with the federal rules. I mean, Rule 12 says that any challenge to an indictment has to be filed before trial. It would be quite odd, I think, to say that that rule doesn't mean anything, because if you raise it after trial or on appeal for the first time, you get a free pass. So the government firmly believes that plain error applies. And here, that standard has not been met. Well, why would that be actual innocence, the case of actual innocence? So Your Honor, Ray Aeth, I'm talking about. I'm sorry? Ray Aeth. Yeah. Why is that not actual innocence? Well, Your Honor, again, the actual innocence part of it would come in the third prong. If the defendant can show, as is his burden under the third prong of the plain error standard, that there is evidence that he is actually innocent of the knowledge, such that there's a reasonable probability that the outcome would be different, then we go to the fourth element. But here, we're not anywhere close. The defendant not only stipulated at trial that he was a prohibited person, but also there was evidence at trial given to the jury that he, upon seeing the police, ran, holding the gun in his waistband, went, fled into a residence. When he came out, he didn't have the gun because he had placed it in a plastic bin to show that as if he had never had it in the first place. So I think all of that taken together would lead one to... That means you're prohibited, you know you're prohibited because you wanted to, didn't want the police to know you had a gun? You equate that to be the same thing? I think that's evidence, pretty strong evidence, from which one could conclude that the defendant knew that he had a prohibited status, that he was a felon. Well, a concealed weapon is illegal in some states, right, without permits, even if... May I answer your own question? Your Honor is certainly right, although I think that that coupled with the fact that the defendant served, was on parole at the time, and served 15 or over a decade for second degree murder in this case, which of course would have been presented to the jury if the defendant hadn't stipulated to his status, makes the question of his proof, the question of proof of his status kind of negligible. I think that's pretty easy, it would have been... You say all the other circuits agree with you? Every single circuit that has decided the question, Your Honor, has decided that... How many of those, seven? Seven, Your Honor. Seven circuits at this point have decided that plain error applies, and at least three or four of those involve trials, just like this one, where the element was not in the indictment. Did you say that the defendant here agrees with you? Well, he agrees, he certainly doesn't... Did you say that? I'm sorry? I didn't want to put words in your mouth. I believe from his brief, he agrees that plain error standard applies. I'm sorry, Your Honor. The defendant's brief also says that the plain error standard applies in this case. Yes, Your Honor. He's not raising structural error? No, Your Honor. He's not saying that there's a structural problem, and again, that's consistent with every case, both on this point as previous cases. Just one more point, if I may, Your Honor, on the response to your question. Even if you found on the third prong that there was somehow some actual innocence because you felt that the defendant had met his burden, that there was a reasonable probability that the outcome in this case would be different, which I would say, given every other case on the point, is a non-starter, given the defendant's criminal record. This is not like the Court's recent opinion in Lockhart, where the person only had one prior at 16 years old. This is a guy who had been convicted and served over a decade in jail and was on parole at the time of his arrest. But even then, on the fourth prong, on whether this kind of error is the kind that this Court should notice, that is, that it affects the fairness and public appearance, integrity of the proceedings, comparing this to the kinds of errors where this Court has declined to so notice would make it very clear that this Court should not exercise its discretion and notice an error. And I'll go back to these Cotton cases, these post-apprendi cases, where this Court, even though those errors affected the maximum penalty that the defendant was applicable to the defendant, even though it affected his actual sentence, this Court declined to notice those errors under the fourth step of the plain error standard. Here, where it has no impact on the defendant's sentence, I would submit that there's no possibility that it affects the fairness or public integrity of the entire proceedings. So basically, you're writing out any impact of the Supreme Court's case holding in Rye. It has to mean something. Well, Your Honor, I can tell you from my own personal experience, it means quite a lot. I mean, going forward, Your Honor, we are put to our burden of proving the element. But that doesn't mean, as is true in any time, the Supreme Court reviews and changes or adds to or alters the elements of the time. You weren't put to the burden of proving the elements. You didn't know it was an element at the time. Your Honor, no one knew exactly that it was an element at the time. And that's, again, exactly like the apprentice situation. So you didn't have to prove it. Your Honor, we didn't have to prove it. And the only reason that there's not even more evidence in the trial record is because the defendant objected to our motion in limine to put in the fact that he had been previously convicted of a second-degree murder and served. Based on the stipulation? Based on the stipulation. If there are no further questions, Your Honor, thank you very much. Thank you, Your Honors. I'd like to make just a couple points, first going back to the Sixth Amendment issue. The government says, under the rule that we're proposing, that this would hamstring the police because they would not be able to investigate other crimes besides the ones that have been charged. And that can't possibly be right. And the Supreme Court has said that. But in fact, the Supreme Court has rejected that view. And again, I refer the Court to the Moulton case, the Maine v. Moulton, which is cited in the government's brief. And the government made that exact argument in that case. And the Supreme Court said, yes, police have an interest in investigating uncharged crimes as well as charged crimes. But when they do so, they have to respect the Sixth Amendment. And they say, quote, in seeking evidence pertaining to pending charges, however, the government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of the Sixth Amendment, for that reason, for their surveillance, invites abuse by law enforcement personnel in the form of fabricated investigations. In other words, yes, you may well have an interest in looking into these other crimes. But you have to do it in a way that respects the Sixth Amendment. And so in this case, where Mr. Medley's Sixth Amendment right had attached as to the gun charge, that means you can investigate other crimes, but not in a way that asks him questions that are inextricably tied up in that offense unless his counsel is present. The government's So let me just stop you there, because I'm at, maybe from a prior question, I'm at, I understand, I have some concerns about being told there was no interest in the D.C. Circuit, or D.C. offense, and then later being charged with essentially the same thing. But I'm, you know, when I read the Supreme Court cases, it looks like unless there's some affirmative effort to misrepresent that it's, that the law's pretty clear on that. So maybe I certainly may have missed something, but that was the way it looked to me from the review of the cases. Is the Maine v. Moulton case the primary thing that I should look to to see how this is different than the Monteo case? So Maine v. Moulton is one of them. I also, I don't agree that affirmative misrepresentation is required. So counsel mentioned the Moran case. In that case, the police did not tell the defendant, oh, your attorney's not trying to get here. They just didn't tell him that the attorney was trying to speak with his client. So it wasn't an affirmative misrepresentation. It was just they withheld information that was relevant to his knowing and intelligent waiver of his right. And in any event, I think in this case we have, you know, something, if not affirmative, something pretty close to affirmative misrepresentation. Now it's true, as government counsel said, that the statements that the detective made may well have been true. Right? I'm here for Maryland. I'm not interested in the D.C. case. That all may be true, but the effect of that was to make Mr. Medley think, okay, what I say to this man is not going to be used against me in the D.C. case. So even if the underlying facts are true, the impression it leaves is that. And, you know, Your Honor, there's just no reason for the detective to go to such lengths to disclaim any interest in D.C. unless what he's trying to do is get the defendant to believe that what you say to me is not going to affect that case. Otherwise, why say anything at all? Why not just say I'm here to ask you about this gun? So bottom line is Mr. Medley didn't understand that what he was saying could be used against him. And again, this court has said and the Supreme Court has said that you have to indulge every reasonable presumption against waiver of a constitutional right to counsel. And the government says, well, all that matters in these cases is who's doing the questioning and not where it's used. But there just is no case that says that, Your Honor. In fact, the sort of black letter law statement of the Sixth Amendment is that when the government deliberately elicits statements and introduces those statements against him at trial, that's the violation of the Sixth Amendment. So wherever this is from the Lentz case, United States v. Lentz that we cite in our brief, wherever the statement comes from, if it's used against you at your trial, that's a violation. It's sort of like there used to be in the Fourth Amendment context this doctrine called the Silver Platter Doctrine, which said that if state officers violate your Fourth Amendment rights, they can give that evidence to federal agents, to federal prosecutors, and federal prosecutors can introduce it at a federal trial. But the Supreme Court rejected that doctrine because it obviously creates perverse incentives. And they said, it doesn't matter where the evidence came from. If obtaining it violated your Fourth Amendment rights, it can't come into trial. And there's no reason not to have the same rule with respect to Sixth Amendment violations. And the government mentioned the passages in Monteo and Patterson where the courts seem to say that a Fifth Amendment waiver suffices as to a Sixth Amendment waiver. But if you read those cases carefully, they say, typically, quote, typically, a Fifth Amendment waiver will suffice for Sixth Amendment purposes, or as a general matter, the two are coextensive. But they also make very clear in that footnote in Patterson and in the McNeil case that that is not always the case. It is perfectly possible to assert your Sixth Amendment rights as to a charged offense while also waiving your Fifth Amendment rights as to uncharged offenses. And we believe that's what happened in this case. Finally, as to Monteo, that is a different situation. Because in that case, the crime that he'd been indicted for and the crime that he was being questioned about afterwards were the same crime. So in that case, a waiver of the Fifth Amendment will be the same as a waiver of the Sixth Amendment because there's only one crime at issue. That's not this case. In this case, Mr. Medley's Sixth Amendment rights had attached as to the DC case, but not as to uncharged conduct. And so the rule in Monteo just doesn't discuss a situation in which there are two different crimes at issue. And again, you can waive as to one, but not the other, as McNeil makes extremely clear. So I see my time is up. Unless the Court has any further questions, I will leave it at that. Thank you, Your Honor. We'll ask the clerk to take a brief recess, and then we'll come back and recount. This Honorable Court will take a brief recess.
judges: Roger L. Gregory, Robert B. King, A. Marvin Quattlebaum Jr.